Filed 4/7/14  P. v. Kane CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JENNIFER ELLA KANE et al.,<br><br>    Defendants and Appellants. | C068209<br><br>(Super. Ct. No. 08F04643) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES ALLEN HOWARD,<br><br>    Defendant and Appellant. | C068210<br><br>(Super. Ct. No. 08F04643) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIE SCOGGINS,<br><br>    Defendant and Appellant. | C068971<br><br>(Super. Ct. No. 08F04643)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

1

The petition for rehearing of defendant Jennifer Ella Kane in Case No. C068209 is denied.

The opinion filed March 12, 2014, in the above cause is modified in the following respects:

On page 2 of the opinion, the last three sentences of the first paragraph are modified to read:  When Wilson arrived, in addition to Cooks and Kane, he found two of Scoggins's friends, James Allen Howard and Randall Powell.  Scoggins was also nearby.  The plan, devised by Scoggins, was to rob Wilson.  When Wilson ran, Powell shot and killed him.

On page 23 of the opinion, the first full sentence is deleted and replaced with the following:  Finally, while the evidence in Scoggins's trial places him a short distance away—in the Shell station parking lot—when the shooting occurred, this does not change the fact he was the one who planned the crime.  We conclude an armed robbery orchestrated by a drug dealer to forcibly regain money taken from him by a street hustler is the type of felony "as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life."  (*Ibid*.)

This modification does not change the judgment.

The petition for rehearing of defendant Willie Scoggins in Case No. C068971 is denied.


        RAYE        , P.J.


      MURRAY        , J.


       HOCH         , J.

2

Filed 3/12/14  P. v. Kane CA3 (unmodified version)

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JENNIFER ELLA KANE et al.,<br><br>Defendants and Appellants. | C068209<br><br>(Super. Ct. No. 08F04643) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES ALLEN HOWARD,<br><br>Defendant and Appellant. | C068210<br><br>(Super. Ct. No. 08F04643) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIE SCOGGINS,<br><br>Defendant and Appellant. | C068971<br><br>(Super. Ct. No. 08F04643) |

1

The events leading to this murder begin with a hustle. Samuel Wilson sold Willie Scoggins three boxes purportedly containing 50-inch flat-screen televisions. The boxes actually contained plywood wrapped in bubble wrap. A few days later, Wilson encountered Scoggins's girlfriend, Shaneil Cooks, and her friend, Jennifer Ella Kane, in a parking lot and offered Cooks the same deal. Cooks informed Scoggins via text message that she found the man who had swindled him. A short time later, Cooks and Kane lured Wilson to a different parking lot under the guise of making a purchase. When Wilson arrived, in addition to Cooks and Kane, he found Scoggins and two of his friends, James Allen Howard and Randall Powell. The plan was to rob Wilson. When Wilson ran, Powell shot and killed him.

Howard, Kane, and Powell were tried together, one jury deciding Howard's case, while a separate jury decided that of Kane and Powell. Scoggins was tried separately. Each defendant was convicted of first degree murder and attempted robbery. The respective juries also found the murder was perpetrated during the attempted commission of the crime of robbery, Powell personally discharged a firearm causing death, Kane and Scoggins were armed during the commission of the offenses, and Howard was not so armed. The trial court sentenced each defendant to serve life in prison without the possibility of parole. Powell was sentenced to serve an additional consecutive term of 25 years to life for being the shooter. Kane was sentenced to serve an additional consecutive one-year term for being armed with a firearm.

Each of these defendants has appealed. We consolidated the appeals. Beginning with two contentions that overlap appeals, Howard argues: (1) the evidence is insufficient to support his attempted robbery and murder convictions. Nor, argues Howard, is the evidence sufficient to support the felony-murder special circumstances finding. Kane and Scoggins also challenge the sufficiency of the evidence to support the special circumstances finding. Howard and Powell also claim: (2) the trial court violated their due process rights by allowing into evidence a pre-trial identification of them based

on their mannerisms in a surveillance video, which was later repudiated at trial. We conclude substantial evidence supports Howard's convictions, but not the special circumstances finding. As we explain, there is no substantial evidence Howard was a major participant in the attempted robbery that resulted in Wilson's death.[1] However, substantial evidence does support the special circumstances finding as to Kane and Scoggins. We need not decide the identification issue because any error was harmless beyond a reasonable doubt.

Turning to contentions raised in case No. C068210, Howard contends: (1) the prosecutor engaged in prejudicial misconduct by urging the jury to draw a negative inference from the absence of defense evidence that was excluded by the trial court; (2) the trial court prejudicially erred and violated Howard's constitutional rights by instructing the jury with CALCRIM No. 400 because that instruction suggested a person is equally guilty of a crime whether he or she committed the crime personally or aided and abetted the perpetrator; (3) Howard's constitutional rights were further violated because CALCRIM Nos. 520 and 521 stated Howard could be found guilty of first degree deliberate and premeditated murder as an aider and abettor as long as the perpetrator had the requisite mental state; (4) the trial court abused its discretion by denying Howard's petition for the release of juror identifying information for purposes of investigating potential juror misconduct; and (5) Howard is entitled to additional presentence custody credit.

We agree Howard is entitled to additional custody credit and reject the remainder of his claims. As we explain, the prosecutor did not engage in misconduct by arguing a

---

[1] This conclusion makes it unnecessary to address Howard's separate claim that the felony-murder special circumstance must be stricken as unconstitutional. And because Howard's sentence must be reduced to a term of 25 years to life, we need not address his additional claim that the trial court's imposition of a parole revocation fine must be stricken as unauthorized.

lack of evidence where the defense would have produced such evidence but for an erroneous evidentiary ruling. Instead, certain evidence was properly excluded and the prosecutor commented fairly on the evidence that was introduced. The trial court did not err in instructing the jury with CALCRIM No. 400, which accurately described the law of aiding and abetting and did not improperly suggest an aider and abettor is equally guilty of the crime of which the direct perpetrator is guilty. And while CALCRIM Nos. 520 and 521, as given to Howard's jury, erroneously suggested Howard could be found guilty of first degree deliberate and premeditated murder as an aider and abettor to Wilson's murder as long as Powell killed Wilson with deliberation and premeditation, this error does not require reversal because the prosecutor was clear in his closing argument that there was no evidence Howard aided and abetted Wilson's murder, the jury was properly instructed that some of the instructions may not apply, and the record discloses the jury found Howard guilty of first degree murder, not as an aider and abettor to deliberate and premeditated murder, but under a felony-murder theory. Finally, the trial court did not abuse its discretion in denying Howard's petition for the release of juror identifying information. Passing contact between jurors and the victim's family members in common areas of the courthouse, where there was no showing such contact amounted to two-way conversation, did not constitute good cause to release the requested information. Thus, with respect to Howard, we strike the special circumstance finding, vacate his sentence of life without the possibility of parole, modify the judgment to impose a prison term of 25 years to life, further modify the judgment to award an additional 21 days of custody credit, and affirm the modified judgment.

In case No. C068209, Kane and Powell contend: (1) the trial court prejudicially erred and violated their constitutional rights by failing to instruct the jury to begin deliberations anew after an alternate was substituted onto the jury. Kane also claims: (2) the trial court prejudicially erred and violated her constitutional rights by failing to instruct the jury to view a certain pre-trial statement she made to Powell with caution;

4

and (3) the trial court's imposition of a parole revocation fine must be stricken as unauthorized. We agree Kane's parole revocation fine must be stricken and reject the remaining contentions raised in this appeal. As we explain, while the trial court should have instructed the jury to begin deliberations anew after an alternate was substituted onto the jury, and also should have instructed the jury to view Kane's pre-trial statement with caution, we conclude these errors were harmless. Thus, with respect to Kane, we modify the judgment to strike the parole revocation fine and affirm the modified judgment. With respect to Powell, we affirm the judgment.

Finally, in case No. C068971, Scoggins contends: (1) the trial court erroneously denied his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Batson/Wheeler* motion) because the prosecutor used a peremptory challenge to remove a prospective juror on the basis of race; and (2) the trial court prejudicially erred and violated his constitutional rights by improperly instructing the jury with CALCRIM No. 403 on the natural and probable consequences doctrine. We disagree with each contention. As we explain, Scoggins failed to make a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Nor did the trial court err in instructing the jury with CALCRIM No. 403. Thus, with respect to Scoggins, we also affirm the judgment.

## FACTS

The evidence adduced before each jury was largely duplicative. Because Howard challenges the sufficiency of the evidence to support his convictions, we state the facts in some detail based on the record produced in his appeal. In accordance with the standard of review, we do so in a light favorable to the judgment. Where relevant, differences in the evidence adduced before the various juries will be set forth in the discussion portion of this opinion.

In June 2008, Scoggins sold crack cocaine out of a house in south Sacramento known as "the Trap." Herman Long owned the house. He and his wife, Cheryl Long,

5

lived there. Lorenzo McCoy, a partner in Scoggins's drug dealing business, also lived at the Trap. Scoggins did not live there, but was "in and out." Scoggins, Howard, and Powell were close friends and called each other "brothers." At the time of the murder, Powell was dating Kane. Scoggins was dating Cooks. Cooks and Kane were also close friends.

A few days before the murder, Scoggins bought what he believed to be three flat-screen televisions from Wilson. After returning to the Trap, he discovered he had actually purchased three flat-screen television boxes containing plywood wrapped in bubble wrap. Scoggins was "upset" that he had been swindled.

On June 8, 2008, Cooks picked Kane up in a white Dodge Ram conversion van and drove to a Costco on Stockton Boulevard. Wilson approached them in the parking lot and asked if they wanted to buy a television. Wilson was driving a blue van and explained that he worked at Circuit City and was selling flat-screen televisions he had "switched" out of Circuit City's inventory. When Cooks expressed interest in making a purchase, Wilson opened the back of the van and showed them a flat-screen television wrapped in bubble wrap. However, rather than try to close the deal in the parking lot, Wilson explained that "he was on his lunch break" and "had to leave." Wilson asked for their phone numbers because "his phone was dead." Kane gave Wilson her cell phone number and told Wilson she would ask her mother whether she wanted to buy a television.

At 5:40 p.m., apparently during Wilson's sales pitch, Kane called Powell and said: "We got the dude that sold the fake TV's." Powell was with another girlfriend, Latoya Tate, when he received this phone call and immediately left Tate's house. Powell told Tate he was going to the gas station and returned about five minutes later. Around this time, Powell called Kane. Also around this time, Cooks called Scoggins, but got his voicemail. At 5:50 p.m., Powell called Scoggins and also got his voicemail. A few minutes later, Powell called Scoggins again. This call was answered. At 5:55 p.m.,

6

Cooks sent the following text message to Scoggins: "Man you ain't answerin' the phone and the dude dat sold you the tvs is in my face right now."

As mentioned, after getting Kane's phone number, Wilson purportedly returned to work at Circuit City. A short time later, Wilson called Kane and asked whether she had talked to her mother. Kane responded: "Yeah, I talked to my mom, she want it." Wilson said he could take a break from work if Kane's mother would meet him to make the purchase. When asked for her mother's phone number, Kane gave Cooks's cell phone number to Wilson. Wilson then called Cooks, who pretended to be Kane's mother, and told her he could take a break from work to make the sale. Wilson told Cooks to meet him at Burlington Coat Factory on Florin Road in 10 minutes. Cooks agreed.

Shortly before 6:00 p.m., Powell called Scoggins several times and the call was sent to voicemail each time. Around the same time, Scoggins called McCoy at the Trap and told him he found the man who had sold him the fake televisions. Scoggins told McCoy the plan was for Scoggins, Powell, and Howard to meet the seller at Burlington Coat Factory, "beat the shit out of the dude," and "take the money back." Howard was present at the Trap while McCoy talked to Scoggins. After Scoggins revealed the plan to McCoy, the phone was passed to Howard. Howard left the Trap a short time later. Powell called Scoggins again at around 6:15 p.m. About the same time, Powell left Tate's house and told her that "he was gonna go meet up with his brothers," which Tate understood to mean Scoggins and Howard.

At about 6:30 p.m., when Wilson arrived at Burlington Coat Factory, he called Cooks and told her to meet him at the Shell gas station across the street because "[t]he police just pulled up." Cooks and Kane met Wilson in a small parking lot directly to the east of the Shell station. When Wilson got out of his van to make the sale, he found Scoggins, Powell, and Howard. Wilson ran. Powell pulled a semi-automatic handgun and shot him twice in the back.

7

One of the bullets entered the left side of Wilson's back, went through the right lobe of his liver, and exited the body through the right side of his abdomen. The other bullet entered Wilson's back as he was doubled over, went through the lower lobe of his left lung, and perforated his heart. These injuries caused "massive blood loss" and resulted in death.

As the cashier at the Shell station described, he heard one or two "firecracker" sounds and immediately looked towards the adjacent parking lot. There, he saw four African-American men, one of whom was shirtless. One of the men ran toward the Shell station, but was "blocked" by one of the other men. When he turned around and ran towards a liquor store at the opposite end of the parking lot, the shirtless man opened fire. The fleeing man fell to the ground before he could make it to the liquor store. The shooter and two others quickly got into a white van and drove away.

The shooting was also witnessed by Cindy Keller, who was driving past the Shell station when the first shots were fired. Keller's sister and niece were also in the car. As Keller explained, she heard three gun shots and saw an African-American man "running very quickly" from another African-American man. The man in pursuit then shot the fleeing victim, who "collapsed" to the ground with "blood coming out of his mouth." The shooter, who was not wearing a shirt, put the gun in his waistband, adjusted a white "do-rag" that was on his head, and ran towards a white van. After picking up the shooter, the van quickly pulled onto Florin Road and cut off Keller's car. Both Keller and her niece identified Kane as the driver of the white van. Keller's sister wrote down the license plate number, which matched Cooks's van.

A short distance down Florin Road, Kane stopped to let Powell and Howard out of the van. Powell told her to meet him at the Trap. Powell and Howard then departed in Powell's car. Kane and Cooks went to the Trap. Kane appeared "really nervous," pacing back and forth, and repeatedly looking both at her cell phone and out the window.

Meanwhile, in the parking lot, bystanders began to surround Wilson's body. One man tried to remove his watch. Scoggins did not leave in the van with the rest of his companions. Instead, he remained in the parking lot until police arrived, provided a statement, and then left the scene. He also went to the Trap. Powell arrived a short time later. He was not wearing a shirt. Howard was the last to arrive at the Trap. McCoy, who was already at the Trap, testified that the local news was on the television; when a story about the shooting came on, Scoggins and Powell told him Powell was the shooter.

Powell returned to Tate's house about an hour after he left to commit the robbery. Howard arrived at Tate's house with his girlfriend later that night. The next day, while Tate was at work, Howard called her and said that "they shot and killed someone." He explained that "they found the guy selling fake TV's" and "they were just supposed to go and try to get the money back from the dude." Howard "seemed very upset" during this phone call and stated he "was concerned about going to jail or being picked up because of something someone else did." Tate already knew about the shooting.

About a week later, a detective spoke to Howard on the phone to set up a time for an interview. During the conversation, Howard stated: "I understand the part that I was there, but I didn't do anything. I didn't do nothing."

Howard did not put on a defense case.

Kane testified in her own defense. She admitted to setting up the meeting with Wilson, but claimed Cooks actually wanted to purchase a television. According to Kane, after Wilson's initial solicitation in the Costco parking lot, Cooks drove to Kane's house so Kane could pick up some money, which she loaned to Cooks to enable her to make the purchase. Kane also admitted to calling Powell on the phone during this time period. She testified that the first call involved "getting some weed" from Powell. According to Kane, Powell said he was busy. After Kane picked up money for Cooks to buy the television, she called Powell again. Powell said he was not ready to be picked up. Cooks and Kane then drove to Burlington Coat Factory to wait for Wilson. While there, Kane

9

spoke to Powell again. According to Kane, when Powell said he was ready to be picked up, she told him "to hold on because [Cooks] was gonna purchase a flat screen television at Burlington." Powell told Kane he would meet her there.

When the meeting place was changed to the Shell station, Cooks and Kane drove across the street, parked near the liquor store in the parking lot next to the Shell station, and got out to look at the televisions. While Cooks negotiated the purchase price, Kane moved Cooks's van closer to Wilson's van because "the television was heavy." As she did so, Powell and Howard ran across the street from the Burlington Coat Factory parking lot. Powell fired four or five shots at Wilson, who fell to the ground. Kane did not see Howard do anything other than run across the street with Powell. After the shooting, Cooks, Powell, and Howard got into the van. Powell told Kane to drive. According to Kane, a short distance down Florin Road, Powell told her to let him and Howard out. Kane complied. Powell told her to meet him at the Trap. Powell and Howard then departed in Powell's car. Kane and Cooks went to the Trap as directed. When Powell arrived, he told Kane she "didn't see anything" and she "better not tell anybody." Powell then drove Kane home and told her she "better not say anything because if anything happened to him, he knows where [her] family lives." Kane denied knowing about any plan to rob Wilson.

Powell's defense centered around discrediting prosecution witnesses, particularly McCoy. For this purpose, a detective testified that he interviewed McCoy the day after the murder. McCoy told the detective his cell phone was turned off and he was using his girlfriend's cell phone on the day of the murder. McCoy also stated in the interview that he owned a white do-rag and he was wearing a black do-rag the day of the murder.

As mentioned, Scoggins was tried separately. We discuss relevant differences in the evidence adduced during his trial in the discussion portion of this opinion, to which we now turn.

10

DISCUSSION

OVERLAPPING CONTENTIONS

**I**

*Sufficiency of the Evidence*

Howard contends the evidence is insufficient to support his attempted robbery and first degree murder convictions. Nor, argues Howard, is the evidence sufficient to support the felony-murder special circumstances finding. Kane and Scoggins also challenge the sufficiency of the evidence to support the special circumstances finding. We conclude substantial evidence supports Howard's convictions, but not the special circumstances finding. As we explain, there is no substantial evidence Howard was a major participant in the attempted robbery. However, substantial evidence does support the special circumstances finding as to Kane and Scoggins.

**A.**

*Attempted Robbery and First Degree Murder*

The prosecution pursued a felony-murder theory of first degree murder based on evidence Howard aided and abetted the attempt to rob Wilson, rendering Howard a principal in that crime, and Wilson was killed during the commission of the robbery attempt. Substantial evidence supports this theory of criminal liability.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations,

11

one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)  Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding.  (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

"[A] person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, citing Pen. Code, § 31.)[2]  " '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Gonzales* (2011) 52 Cal.4th 254, 295-296, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561.)  "Whether a person has aided and abetted in the commission of a crime is a question of fact, and on appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment.  Among the factors which may be considered in determining aiding and abetting are:  presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fns. omitted.)

Here, the evidence showed Howard was at the scene of the crime.  Indeed, he admitted to being there:  "I understand the part that I was there, but I didn't do anything. I didn't do nothing."  Kane also testified Howard was at the crime scene.  Howard, Powell, and Scoggins were close friends.  Howard was at the Trap when Scoggins called and told McCoy about the plan to rob Wilson.  After the plan was divulged to McCoy, the phone was passed to Howard, who left the Trap a short time later.  According to the

---

[2]        Undesignated statutory references are to the Penal Code.

12

plan, Kane and Cooks lured Wilson to the parking lot, where he was ambushed by Powell, Scoggins, and Howard. After Powell shot Wilson, Howard fled the scene with Powell, Cooks, and Kane. Howard then hung out at the Trap with Powell, Scoggins, Cooks, and Kane. Later that night, he continued to hang out with Powell at Tate's house. The following day, while Tate was at work, Howard called her and said that "they shot and killed someone," explaining that "they found the guy selling fake TV's" and "they were just supposed to go and try to get the money back from the dude." From this evidence, the jury was justified in concluding Howard knew about the plan to rob Wilson, intended to facilitate the commission of the offense, and aided, promoted, or encouraged the attempted robbery.

Howard's liability for first degree murder is more straightforward. "All murder . . . which is committed in the perpetration of, or attempt to perpetrate [certain enumerated offenses, including robbery] is murder of the first degree." (§ 189.) "The mental state required is simply the specific intent to commit the underlying felony [citation], since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute. [Citations.] 'Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he [or she] comes directly within a clear legislative warning – if a death results from his [or her] commission of that felony it will be first degree murder, regardless of the circumstances.' [Citation.]" (*People v. Cavitt* (2004) 33 Cal.4th 187, 197; *People v. Roberts* (1992) 2 Cal.4th 271, 316 ["the consequences of the evil act are so natural and probable that liability is established as a matter of policy"].) Wilson was gunned down during an attempted robbery. Having found substantial evidence supporting Howard's conviction for the attempted robbery, we must also conclude substantial evidence supports his conviction for first degree murder on a felony-murder theory.

## *Special Circumstances Finding*

Howard also claims the evidence is insufficient to support the felony-murder special circumstances finding. We agree.

"In order to support a finding of special circumstances murder, based on murder committed in the course of robbery, against an aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony." (*People v. Proby* (1998) 60 Cal.App.4th 922, 927 (*Proby*), citing § 190.2, subds. (c), (d).)[3] We first note there is no evidence Howard possessed the intent to kill Wilson, as required by section 190.2, subdivision (c).

"Subdivision (d) of section 190.2, concerning reckless indifference, 'was added by Proposition 115 in order to bring the death penalty into conformity with [*Tison v. Arizona* (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 144] (*Tison*)]. [Citation.] *Tison* held that the death penalty may be imposed in a case of "major participation in the felony committed, combined with reckless indifference to human life." Put another way, *Tison* held "that the reckless disregard for human life implicit in knowingly engaging in criminal activities

---

[3] Section 190.2, subdivision (c), provides: "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." Subdivision (d) of this section provides: "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." [Citation.]' [Citation.] The term 'reckless indifference to human life' means 'subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.' [Citation.]" (*Proby*, *supra*, 60 Cal.App.4th at pp. 927-928.) The term "major participant" includes not only "the triggerman and the ringleader" of the criminal enterprise, but also includes any accomplice who is " 'one of the larger or more important' " participants, or whose participation is " 'notable or conspicuous in effect or scope.' " (*Id*. at pp. 933-934.)

The major participant and reckless indifference requirements "often overlap." (*Tison*, *supra*, 481 U.S. at p. 158, fn. 12 [95 L.Ed.2d at p. 144].) As the United States Supreme Court explained: "[W]e do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding." (*Ibid*.)

In *People v. Lopez* (2011) 198 Cal.App.4th 1106 (*Lopez*), codefendants Lopez and Brousseau decided to "rob some tricks." When Brousseau lured the victim into a secluded alley with a promise of prostitution, Lopez walked over to the victim's car, pulled out a handgun, and demanded money. An argument ensued. Lopez shot and killed the victim. (*Id*. at pp. 1109-1110.) Brousseau knew Lopez was armed when she agreed to help him commit a robbery. (*Id*. at p. 1116.) Lopez and Brousseau were each convicted of attempted robbery and first degree murder with a robbery-murder special circumstances finding. (*Id*. at p. 1108.) Rejecting Brousseau's argument that the special circumstances finding was not supported by substantial evidence, this court held: "The

15

fact Brousseau knew Lopez had a gun shows that she acted with reckless indifference to the life of the man she lured into the alley." (*Id*. at p. 1116.) We further held the special circumstances finding would stand even in the absence of such knowledge, explaining: "Brousseau's act of luring the victim into the secluded alley was critical to the robbery's success. After hearing what she knew was a gunshot, she failed to help the victim or call 911. Instead she went to [the] house [where Lopez picked up the gun] and stayed with [Lopez] for the rest of the night and, on the evidence, engaged in sexual intercourse with Lopez. Her actions reflect utter indifference to the victim's life." (*Id*. at p. 1117.)[4]

In so holding, we relied on *People v. Hodgson* (2003) 111 Cal.App.4th 566 (*Hodgson*) and *People v. Smith* (2005) 135 Cal.App.4th 914 (*Smith*), disagreed with on another point in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291-292. In *Hodgson*, the victim was robbed by Salazar and Hodgson as she drove her car up to the underground parking garage of her apartment complex. When the victim opened the electric gate to the garage, Salazar approached with a handgun and fired a round through the driver's side window, striking the victim in the neck. The victim's car rolled into the garage and collided with a pillar and another car. Salazar followed and fired another round into the victim's head. As Salazar grabbed the now-deceased victim's purse and wallet, Hodgson held the electric gate open to enable Salazar's escape from the garage. (*Hodgson*, *supra*, 111 Cal.App.4th at p. 570.) Noting there was no evidence Hodgson "supplied the gun, or was armed, or personally took the loot, or the like," the Court of Appeal nevertheless held there to be substantial evidence Hodgson acted with reckless indifference to human life while acting as a major participant in the robbery. (*Id*. at pp. 579-580.)

---

[4]     The framing of the issue in *Lopez* rendered it unnecessary for us to address the question of whether Brousseau acted as a major participant in the robbery. (See *Lopez*, *supra*, 198 Cal.App.4th at p. 1115 ["Brousseau contends no substantial evidence supports the robbery-murder special circumstance finding, because the evidence does not show she acted with reckless indifference to human life"].)

16

Beginning with the major participant requirement, the court explained: "To begin with, this is not a crime committed by a large gang or a group of several accomplices. Instead only two individuals were involved. Thus, [Hodgson's] role was more 'notable and conspicuous' — and also more essential — than if the shooter had been assisted by a coterie of confederates. By slowing down the closing automatic electric garage gate [Hodgson] was instrumental in assisting Salazar effect his escape with the loot. From their actions it appears [Hodgson] and Salazar believed the garage gate was the only access route for their escape. The evidence showed [Hodgson] used the full force of his body to try to keep the gate from closing until Salazar had accomplished the robbery and secured the loot. When the gate became dangerously close to closing [Hodgson] yelled a warning to Salazar and got out of his way to permit Salazar to exit. [Hodgson's] actions suggest he believed Salazar would have been trapped inside the garage with his victim unless he acted to prevent the gate from closing. The fact police later discovered a low wall over which someone could have climbed to reach the street does not alter the men's own perception of the roles each had to play. Because [Hodgson] was the only person assisting Salazar in the robbery murder his actions were both important as well as conspicuous in scope and effect." (*Hodgson*, *supra*, 111 Cal.App.4th at pp. 579-580.)

Turning to the reckless indifference requirement, the court explained: "A rational juror could also have found the evidence established [Hodgson] acted with 'reckless indifference to human life.' This phrase 'is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death.' Even after the first shot it must have been apparent to [Hodgson that the victim] had been severely injured and was likely unconscious. Her car rolled into the garage and collided with a pillar and another car. [Hodgson] had to be aware use of a gun to effect the robbery presented a grave risk of death. However, instead of coming to the victim's aid after the first shot, he instead chose to assist Salazar in accomplishing the robbery by assuming his position at the garage gate and trying to keep it from closing

17

until Salazar could escape from the garage with the loot." (*Hodgson*, *supra*, 111 Cal.App.4th at p. 580, fn. omitted.)

Similarly, in *Smith*, *supra*, 135 Cal.App.4th 914, the Court of Appeal held there to be substantial evidence supporting a robbery-murder special circumstances finding as to a man, Taffolla, who played the role of lookout in an attempted robbery. Taffolla remained outside the victim's motel room while codefendant Smith entered the room to commit the robbery and another man went to get his car to act as the getaway driver. (*Id*. at p. 920.) Inside the motel room, Smith stabbed the victim multiple times, beat her repeatedly in the face with an iron, and slammed her head through a wall. (*Id*. at pp. 927-928.) Finding substantial evidence that Taffolla acted with reckless indifference to human life, the court explained: "[T]he jury could have found Taffolla gained a 'subjective awareness of a grave risk to human life' during the many tumultuous minutes it would have taken for [the victim] to be stabbed and slashed 27 times, beaten repeatedly in the face with a steam iron, and had her head slammed *through* the wall. In addition, when Smith emerged from [the victim's] room covered in enough blood to leave a trail from the motel to McFadden Street, Taffolla chose to flee rather than going to [the victim's] aid or summoning help." (*Id*. at p. 927.) Turning to the major participant requirement, the court explained: "The jury could have found beyond a reasonable doubt that Taffolla's contributions were 'notable and conspicuous' because he was one of only three perpetrators, and served as the only lookout to an attempted robbery occurring in an occupied motel complex. [Citation.] Unlike the hypothetical 'non-major participant' in [*Tison*, *supra*, 481 U.S. 137] — who 'merely [sat] in a car away from the actual scene of the murders acting as the getaway driver to a robbery' — Taffolla stood sentry just outside [the victim's] room, where the jury could infer he monitored and guarded the increasingly lengthy, loud, and violent attempted robbery-turned-murder. [Citation.]" (*Smith*, *supra*, 135 Cal.App.4th at p. 928.)

18

We now turn to the facts of this case and begin our analysis with the reckless indifference requirement. Unlike *Lopez*, *supra*, 198 Cal.App.4th 1106, there is no evidence Howard knew Powell was armed. However, nor was there any evidence Howard was surprised Powell had the gun or surprised Powell shot Wilson. (See *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754.) Moreover, Howard admitted to Tate the day after the murder that he met up with Powell and Scoggins to "try to get the money back from the dude" who sold fake televisions to Scoggins. McCoy testified that Scoggins told him the plan was to "beat the shit out of the dude" and "take the money back." The phone was then passed to Howard. While we do not know the precise content of the conversation between Scoggins and Howard, from the fact Scoggins told McCoy about the plan, then talked to Howard, and Howard immediately left to join Scoggins and Powell at the scene, the jury could reasonably infer Scoggins also told Howard about the plan to rob Wilson and asked if Howard wanted in. And even if Scoggins did not specifically tell Howard the plan involved physical violence, Howard had to be aware of the danger Wilson would resist any attempt to take money from him, and violence would almost certainly result. Furthermore, like each of the cases described above, when it became clear Wilson was in need of immediate medical attention, rather than go to his aid or call for help, Howard fled the scene with his confederates. (*Lopez*, *supra*, 198 Cal.App.4th at p. 1117; *Hodgson*, *supra*, 111 Cal.App.4th at p. 580; *Smith*, *supra*, 135 Cal.App.4th at p. 927; *Proby*, *supra*, 60 Cal.App.4th at p. 929; see also *People v. Mora* (1995) 39 Cal.App.4th 607, 617; *People v. Bustos*, *supra*, 23 Cal.App.4th at p. 1754.) We conclude Howard's actions revealed a reckless indifference to human life.

We now turn to the major participant requirement. While, as mentioned, *Lopez*, *supra*, 198 Cal.App.4th 1106 did not address this issue, there can be no doubt Brousseau acted as a major participant in the attempted robbery in that case by luring the victim to his demise. Indeed, as we stated in that opinion, "luring the victim into the secluded alley was critical to the robbery's success." (*Id*. at p. 1117.) Here, it was Kane and Cooks who

19

lured Wilson to the scene of the attempted robbery, not Howard. The record in *Lopez* also included evidence that Brousseau was the one who suggested that she " 'pull a trick' " and " 'bring [him] to the alley' " to enable Lopez to rob the victim. (*Id*. at p. 1110.) Thus, similar to *People v. Mora*, *supra*, 39 Cal.App.4th 607, where the Court of Appeal found there to be "no question as to the 'major participant' element," Brousseau "helped plan the robbery" and was "instrumental" in arranging the gunman's access to the victim. (*Id*. at p. 617.) Here, in contrast, there is no evidence Howard helped plan the robbery. It was Kane and Cooks who found Wilson in the Costco parking lot, starting a series of phone calls between Cooks and Scoggins, Kane and Powell, and Powell and Scoggins. As mentioned, Scoggins called McCoy at the Trap and told him about the plan to rob Wilson *before* the phone was passed to Howard. Thus, while the jury could reasonably infer Scoggins also told Howard about the plan to rob Wilson, what cannot be reasonably inferred is any planning activity on the part of Howard.

Moreover, unlike *Hodgson*, *supra*, 111 Cal.App.4th 566, where the robbery was committed by "only two individuals," both of whom were major participants ― one being the shooter and the other being "instrumental in assisting [the shooter] effect his escape with the loot" ― here, the shooter was "assisted by a coterie of confederates," the least notable and conspicuous of whom was Howard. (*Id*. at pp. 579-580.) Nor was Howard's participation analogous to that of the lookout in *Smith*, *supra*, 135 Cal.App.4th 914. As mentioned, *Smith* involved three perpetrators, one of whom left the scene to get his car, leaving Smith to enter the motel room to commit the robbery and Taffolla to remain outside the room to serve as lookout. As "the only lookout to an attempted robbery occurring in a occupied motel complex," the court found Taffolla's contribution to have been both notable and conspicuous. (*Id*. at p. 928.) The court also noted that Taffolla "stood sentry" during an "increasingly lengthy, loud, and violent attempted robbery-turned-murder." (*Ibid*.) We certainly agree that the longer, louder, and more violent the attempted robbery, the more notable is the lookout's contribution. But here,

20

there is no evidence Howard did anything other than stand near Powell in the parking lot when Wilson was gunned down. While the jury could reasonably infer Howard was invited to join in on the robbery, at least in part, to have an additional set of eyes looking out for police, there is no evidence Howard served as the sole lookout. Nor is there any evidence the attempted robbery-turned-murder took an extended amount of time to accomplish, requiring a notable amount of discipline in order for Howard to stand guard throughout the commission of the crime. On the contrary, it took mere seconds for Powell to shoot the fleeing Wilson and for Powell, Howard, Kane, and Cooks to jump in the van and drive away.

However, the fact that Howard's level of participation can be distinguished from that of the accomplices at issue in the foregoing cases does not end the inquiry. There is a continuum from the level of contribution provided by the triggerman and the ringleader (who are without question major participants (see *People v. Marshall* (1990) 50 Cal.3d 907, 938)), to that provided by an accomplice who helped with the planning and played a critical role (also a major participant (see *Lopez*, *supra*, 198 Cal.App.4th at pp. 1110, 1117; *People v. Bustos*, *supra*, 23 Cal.App.4th at p. 1754 [accomplice helped plan the robbery and initiated commission of the crime])), to that provided by an accomplice who did not help with the planning, but nevertheless played a critical role (also falling on the side of major participation (see *Hodgson*, *supra*, 111 Cal.App.4th at pp. 579-580; *Smith*, *supra*, 135 Cal.App.4th at p. 928; *Proby*, *supra*, 60 Cal.App.4th at p. 929 [accomplice was armed during the robbery and provided the shooter with the gun used to kill the victim])), to that provided by an accomplice who "merely [sat] in a car away from the actual scene of the murders acting as the getaway driver to a robbery" (falling on the side of non-major participation (see *Tison*, *supra*, 481 U.S. at p. 158 [95 L.Ed.2d at p. 144])). The question we must answer is this: On what side of the line does Howard fall?

The Attorney General argues Howard was a major participant because, under the plan, "it was [Howard's] duty to pull Wilson into Cooks's van" in order to facilitate the

21

robbery. In support of this assertion, she cites testimony from a detective who interviewed McCoy. The prosecutor asked the detective: "Did [McCoy] tell you *whether or not* the plan was to have Howard, somebody that he referred to as Frankie, grab the dude and pull him into the van?" (Italics added.) The detective answered: "Yes." The prosecutor then moved on to another area of questioning. Thus, while the record contains evidence McCoy was told whether or not Howard was supposed to pull Wilson into Cooks's van, there is no evidence this was, in fact, the plan. Based on the facts of this case, we cannot conclude Howard was " 'one of the larger or more important' " participants in this attempted robbery-turned-murder, or that his participation was " 'notable or conspicuous in effect or scope.' " (*Proby*, *supra*, 60 Cal.App.4th at pp. 933-934.) He joined in this criminal enterprise with Scoggins, Powell, Kane, and Cooks, and for that he was rightly convicted of attempted robbery and first degree murder. But that is where his criminal liability ends.

We now turn to the arguments raised by Kane and Scoggins. Neither defendant challenges the implied finding of major participation. Nor could they. Kane was instrumental in setting up the attempted robbery, luring Wilson to the parking lot where he was gunned down. (See *Lopez*, *supra*, 198 Cal.App.4th at p. 1117.) Scoggins was the one who had been ripped off by Wilson. Based on all the evidence adduced in his trial, which mirrored that described above, the jury could reasonably have inferred he was the shot caller for this particular crime or at the very least, motivated the others to help him forcibly get his money back. (See *People v. Marshall*, *supra*, 50 Cal.3d at p. 938 [ringleader is a major participant].) Kane and Scoggins do challenge the sufficiency of the evidence to prove they acted with reckless indifference to human life. Having concluded Howard acted with the requisite mental state, we have no doubt the same conclusion holds for Kane and Scoggins. As mentioned, the major participant and reckless indifference requirements "often overlap." (*Tison*, *supra*, 481 U.S. at p. 158, fn. 12 [95 L.Ed.2d at p. 144].) Thus, the fact Kane and Scoggins provided more of a

contribution to the attempted robbery than Howard suggests a more culpable mental state, not less. Indeed, we conclude an armed robbery orchestrated by a drug dealer to forcibly regain money taken from him by a street hustler is the type of felony "as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life." (*Ibid.*)

**II**

*Admission of Identification Evidence*

Howard and Powell claim the trial court prejudicially erred and violated their constitutional rights to due process by allowing into evidence testimony that Cheryl Long identified them in a surveillance video that captured the shooting. We need not decide the issue because any error was harmless.

The day after the shooting, a Sheriff's deputy had a conversation with Long about the murder and showed her images of Powell and Howard on his patrol car computer. Two days later, detectives picked Long up and brought her to a Sheriff's department substation to show her surveillance video taken from a cellular phone store in the strip mall where the shooting occurred. The poor quality of the video made it impossible to identify any of the subjects by their faces. Long, however, told detectives Powell was the shooter and Howard was standing in the background near the white van. This identification was "based on their mannerisms and the way they moved." Long repudiated this identification at trial and testified: "I was just goin' by what someone else told me, what [McCoy] told me, and so I could get some money." Long testified she was a drug addict and wanted money to buy drugs. She was paid $50. The receipt for the payment stated the money was for "motel and food." After the meeting, Long was driven to a residence by one of the deputies. She was not taken to a motel.

Howard argues the "subsequently-repudiated identification of Howard and Powell on the surveillance video recording was the product of impermissibly suggestive conduct." Powell argues that, aside from "improper governmental conduct," the trial

23

court should have excluded the "unreliable" identification under an Evidence Code section 352 analysis. We need not decide whether the trial court erred in admitting the identification evidence. Assuming error, and regardless of what standard of prejudice is employed, we find the error to have been harmless. As mentioned, Long repudiated the identifications at trial and provided ample reason for the respective juries to find them lacking in credibility. Thus, it is doubtful the juries gave the identifications much weight.

More importantly, there is abundant evidence both Howard and Powell were at the scene of the crime and that Powell was the shooter. With respect to Howard, as mentioned, he admitted to being there: "I understand the part that I was there, but I didn't do anything." Kane's trial testimony corroborated Howard's admission to being at the crime scene. Circumstantial evidence also places Howard at the scene of the crime. As mentioned, Howard, Powell, and Scoggins were close friends. Howard was at the Trap when Scoggins called and told McCoy about the plan to rob Wilson. After the plan was divulged to McCoy, the phone was passed to Howard, who left the Trap a short time later. After the shooting, Howard hung out at the Trap with Powell, Scoggins, Cooks, and Kane. And the next day, Howard told Tate that "they shot and killed someone," "they found the guy selling fake TV's," and "they were just supposed to go and try to get the money back from the dude." Based on the foregoing evidence, we conclude beyond a reasonable doubt the jury would have found Howard was at the crime scene even if Long's identification had been excluded.

With respect to Powell, McCoy testified Powell admitted to being the shooter. Kane's trial testimony corroborated Powell's admission to being the shooter. Circumstantial evidence also places Powell at the scene of the crime and points to him as the shooter. Again, Powell, Howard, and Scoggins were close friends. Kane called Powell and informed him she had made contact with "the dude that sold the fake TV's." A series of calls were then made between Kane and Powell, Powell and Scoggins, and Cooks and Scoggins. About 15 minutes before the shooting, Powell left Tate's house and

24

told her that "he was gonna go meet up with his brothers," which Tate understood to mean Scoggins and Howard. Eyewitnesses testified the shooter was not wearing a shirt. When Powell arrived at the Trap after the shooting, he was not wearing a shirt. Based on the evidence, we also conclude beyond a reasonable doubt the jury would have found Powell was the shooter even if Long's identification had been excluded.

HOWARD APPEAL

I

***Prosecutorial Misconduct***

Howard contends the prosecutor engaged in prejudicial misconduct during closing argument by arguing there was no evidence Wilson had a gun at the time he was killed. The reason, argues Howard, is that the prosecutor successfully objected to his defense counsel's questioning of Wilson's fiancée, Ashawnee Bowen, regarding whether or not Wilson had a gun during the period of time preceding the shooting. He is mistaken.

**A.**

***Additional Background***

During Howard's defense counsel's opening statement, she stated the surveillance video would show "something," possibly "a gun," or "a weapon," or "an object that held a weapon," flew out of Wilson's hands immediately before he was shot.

During Howard's defense counsel's cross-examination of Bowen, counsel asked: "Did [Wilson] ever have a gun that you were aware of?" The prosecutor's relevance objection was sustained. Counsel then asked: "Do you know if he kept a gun during that time period?" The prosecutor again objected on relevance grounds. This objection was also sustained. After a discussion at sidebar, the trial court confirmed its ruling.

During closing argument, after commenting that Wilson ran "for his life" before he was shot, the prosecutor stated: "Now, [Howard's defense counsel] told you in her opening that [Wilson] had a gun. Okay. There is absolutely no evidence of that at all. None. And she talked about --" At this point, defense counsel objected: "Statements of

25

counsel are not evidence." The trial court overruled the objection and reminded the jury: "The statements of lawyers are not evidence. This is argument. This is their attempt to persuade you on the evidence before the Court." The prosecutor continued: "Let's talk about what she told you in her opening statement. She told you and she submitted to you that that object that flew off, if you're looking at the screen would be off to the right, she submitted and implied that that was a gun. And, you know, there was an objection made. [¶] Watch the footage. Watch that. Slow it down frame-by-frame if you want. And you will see very clearly that that is a towel. In fact, you will see it drop and you will see [Wilson] running in one direction first and his foot actually grabs at it, slips on it and kicks it up and then he's got nowhere to go and he runs back. [¶] And what do they find right in that area consistent with what you see on the footage? That brown Nautica towel. Yeah, that's a gun, right? That's not a gun. That's a towel. There's no evidence that he had a gun. These guys -- he wasn't shot because, you know, he had a gun."

Following the prosecutor's closing argument, outside the presence of the jury, the trial court gave Howard's defense counsel an opportunity to be heard regarding her objection. Counsel stated: "It appeared to me that, first of all, [the prosecutor] was saying that I didn't do certain things, which is burden-shifting. It's also trying to disparage counsel. Counsel quoted things that I said in my opening statement, which is not evidence." The trial court noted defense counsel's objections were timely and that the court had ruled.

Following Howard's conviction, his defense counsel filed a motion for new trial and argued: "The point being raised in this brief is that it was misconduct for [the] prosecutor to argue the absence of evidence that he specifically objected to at trial. During the cross examination of [Bowen] counsel for [Howard] attempted to cross examine her as to whether [Wilson] had owned a gun. The prosecution object[ed] and a side bar was held. At side bar the defense argued that where the gun came from was relevant to intent. It made a difference if the shooter brought a gun or if the shooter took

26

[Wilson's] gun. The court sustained the objections. The prosecution had full knowledge of [the fact] that the defense had a telephone call in which the caller stated that [Wilson] had left her house with his gun and televisions shortly before being shot as it was provided on [a certain] CD provided in[]discovery and pl[a]yed for the prosecutor at a break. To argue that the defense failed to produce any evidence connecting Wilson with a gun after getting the evidence effectively excluded was misconduct and a new trial should be granted."

In response, the prosecution argued: "In her opening statement, [Howard's defense counsel] told the jury that a gun can be seen getting tossed by the victim. [Defense counsel] then began to ask the victim's fiancé[e] whether or not the victim owned a gun. At sidebar, [defense counsel] wanted to follow-up that line of questioning by referring to a phone call captured by the Department of Justice during a wiretap. The individual speakers in that wiretap phone call were neither the victim, nor his fiancé[e]. The People objected to the hearsay. The objection was sustained. In closing arguments on this point, the People argued simply the following: that [defense counsel] mentioned in her Opening Statement that the victim tossed a gun; that the jury can watch the video as many times as they like; that the object tossed was no gun, rather it was a towel. [¶] More specifically, during the trial the People objected to [defense counsel] attempting to get a hearsay statement of a phone call in evidence without calling any party to that phone call to the stand as a witness. Defense counsel argues now that the evidence was relevant to intent, stating 'it made a difference if the shooter brought a gun or if the shooter took [Wilson's] gun.' If such evidence was so compelling to the defense, they should have called those witnesses to the stand. Trying to get such hearsay evidence in through another witness is not permissible. To argue that the Prosecutor excluded the evidence and then committed misconduct is inaccurate. The Prosecution objected to the method being used by the defense, not the content." (Fn. omitted.)

27

During the hearing on the new trial motion, Howard's defense counsel clarified that "there is a telephone call on the [Department of Justice] tape saying: '[Wilson] left with his gun and his television' not three hours before [Powell] shot him." Defense counsel stated she believed it was Wilson who pulled a gun during the exchange in the parking lot, and that Powell took Wilson's gun and shot him with it. The trial court responded: "But as you know, I have to have some competent evidence to support that belief. [¶] And my recollection at trial, and having reviewed the District Attorney's papers, that there was a side bar about your discussion about offering evidence before the jury that the victim had a gun, but you, in essence, said the same thing you are saying today, that supposedly the victim stopped someplace, that supposedly the victim was either provided or picked up a gun. [¶] And when I asked you how you were [going to] demonstrate those matters, I was convinced, as I recall, that there was no competent evidence of those facts. [¶] Do you have anything to suggest that is true at all today?"

Howard's defense counsel responded: "Within the information, and the person I was trying to cross-examine was [Bowen], and within the reports we got, she did not allow [Wilson] to keep his gun at her house. [¶] She was aware that -- I believe she was aware that he had a gun, according to the reports back and forth, whether or not he had a gun, that he had access to or not. But there would have been competent evidence had we had the funding at least [to] bring in the person who saw him take the gun." The trial court interrupted: "You are saying that you would have had the opportunity to investigate that issue had you had funding to investigate that further. You're referring to what?" Defense counsel explained she put in a request for funding to allow an investigator to go to the address linked to the wiretapped phone call and attempt to locate the person who said Wilson had left with a gun. However, while identified in the wiretapped phone call by name, defense counsel explained that the person who made the statement "is a very fast talker, and it's very hard to understand what the name is." Defense counsel stated her request for funding was denied. When asked whether she

28

sought a court order requiring payment of such investigation expenses, defense counsel answered: "I did not petition the Court, no. I did make several calls to the panel. [¶] I was not able to reach the people in charge of the funding. I sent emails, dropped by to talk to the person. They were always in conference when I dropped by. This was during trial."

In response, the prosecutor argued: "[T]he thrust of [Howard's defense counsel's] argument is that there was misconduct, because in my closing argument, I referenced what she promised in her opening statement. [¶] She told the jury in the opening statement, that if you watched the video, you will see the victim toss a gun, have a gun. That's what she said in opening statement. [¶] I think it was pretty clear through the evidence and through watching that video over and over, that that was the towel that was found right there where that object flew. [¶] There was no evidence of any gun. [¶] So in closing argument, I pointed out to the jury, what [defense counsel] had said. And I told them to watch the video, and I told them that all the evidence indicates that that is a towel." With respect to defense counsel asking Bowen about the wiretapped phone call, the prosecutor argued: "[Bowen] was not a speaker on that phone call that was recorded by the Department of Justice. [¶] I objected. It wasn't relevant with that witness. It was hearsay. [¶] We had a side bar. She made a similar argument that she makes today. [¶] Asking that question of [Bowen] was improper. And as I listed in my motion, I asked [defense counsel]: Hey, do you plan on calling the witnesses from the bay area that were the speakers on that phone call? And she said, no, she couldn't find them. [¶] So now she is saying that somehow I did something to exclude that evidence. All I did was just object to her bringing in that evidence through [Bowen] which would have been improper."

The trial court denied the new trial motion, finding "no misconduct by the prosecutor in his comment about the lack of evidence that [Wilson] had a firearm," and "no misconduct by the prosecutor in, quote, 'burden shifting.' The prosecutor engaged in

29

fair comment about the evidence." The trial court further explained that "there was no competent evidence to demonstrate [Wilson], either by custom or practice, was armed, or that on that morning he somehow had the opportunity to arm himself. [¶] And even if he did, there was no evidence that he was armed at the time of the shooting. [¶] And if your position is that your client was denied the opportunity to investigate that because there is not enough money to pay for investigators, that is not before me. There is no competent evidence of that, and I suppose you can pursue that by collateral relief."

**B.**

*Analysis*

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

" 'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567-568; *People v. Williams* (1997) 16 Cal.4th 153, 221.) It is also settled that, while "[t]he prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide," fair comment "on the failure of the defense to introduce material evidence or to call logical witnesses" is permitted. (*People v. Brady* (2010) 50 Cal.4th 547, 566; *People v. Chatman* (2006) 38 Cal.4th 344, 407.) However, the prosecutor may not seek to mislead the jury by arguing "a 'lack' of evidence where the defense was ready and willing to produce it," and would have done so but for an erroneous evidentiary ruling. (*People v. Varona* (1983) 143

Cal.App.3d 566, 570 (*Varona*); *People v. Daggett* (1990) 225 Cal.App.3d 751, 758 [prosecutor "unfairly took advantage" of an erroneous evidentiary ruling by arguing for "the jurors to draw an inference that they might not have drawn if they had heard the evidence the judge had excluded"]; *People v. Lawley* (2002) 27 Cal.4th 102, 156 [distinguishing *Varona* and *Daggett* because these cases "involved erroneous evidentiary rulings on which the prosecutor improperly capitalized during his closing argument"].)

Howard relies on the foregoing rule, placing particular emphasis on *Varona*, *supra*, 143 Cal.App.3d 566. In that case, two defendants contended the alleged rape victim was a prostitute who claimed to have been kidnapped and raped only after she discovered they could not pay for her services. (*Id*. at p. 568.) The Court of Appeal held the trial court committed reversible error by excluding evidence that the alleged victim had previously pled guilty to prostitution. (*Id*. at pp. 569-570.) The court further held the prosecutor engaged in prejudicial misconduct by arguing there was no evidence the alleged victim was a prostitute, and by affirmatively asserting she was not a prostitute: "Here, the prosecutor not only argued the 'lack' of evidence where the defense was ready and willing to produce it, but he compounded that tactic by actually arguing that the woman was not a prostitute although he had seen the official records and knew that he was arguing a falsehood." (*Id*. at p. 570.)

Here, unlike *Varona*, Howard does not argue the trial court's evidentiary rulings were erroneous. Nor would we find error in excluding Bowen's testimony regarding a wiretapped conversation she was not a part of, in which one of two unknown individuals purportedly said that " '[Wilson] left with his gun and his television' " about three hours before the shooting. The out-of-court statement was offered for the truth of the matter asserted, i.e., Wilson had in fact left the declarant's location with a gun about three hours before the shooting, making it more likely he was armed during the confrontation in the parking lot, and since a gun was not found in Wilson's van or elsewhere at the crime scene, leading to an inference that Powell had taken Wilson's gun rather than bring a gun

31

to the attempted robbery-turned-murder. Accordingly, the statement is hearsay and inadmissible unless an exception to the hearsay rule applies. (Evid. Code, § 1200.) Howard has cited no applicable exception. Nor does it appear Bowen had personal knowledge of the wiretapped conversation. Thus, even if the hearsay statement could have come into evidence, it would have had to come in through a different witness. Moreover, even if Bowen should have been allowed to testify that she personally knew Wilson to own a gun, we would not find such error to be prejudicial. While ownership of a gun may make it slightly more likely Wilson was carrying this gun the day of the shooting, it does nothing to negate the evidence that Kane and Cooks set up Wilson to be robbed by Scoggins, Powell, and Howard.

*Varona, supra,* 143 Cal.App.3d 566 is distinguishable for another, more fundamental, reason. Here, the prosecutor did not assert the existence of a fact he knew to be false. Instead, he told the jury to watch the surveillance video to determine whether the object that falls to the ground is a gun or a towel, argued the object was the towel that was found at the scene, and stated: "There's no evidence that he had a gun." That statement was true. We conclude the prosecutor's argument did not amount to arguing a known falsehood. It was not misconduct, but rather "fair comment on the evidence." (*People v. Lawley*, *supra*, 27 Cal.4th at p. 156.)

## II

### *Instructional Error – CALCRIM No. 400*

Howard claims the trial court prejudicially erred and violated his constitutional rights by instructing the jury with CALCRIM No. 400 on aiding and abetting. Howard did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We find no error, much less a miscarriage of justice.

32

CALCRIM No. 400, as given to Howard's jury, provided: "Now, a person may be guilty of a crime in two ways: [¶] 1. He or she may have directly committed the crime. I will call that person the perpetrator. [¶] 2. He or she may have aided and abetted a perpetrator who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

Relying on *People v. Samaniego* (2009) 172 Cal.App.4th 1148 (*Samaniego*) and *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*), Howard argues this instruction "erroneously suggested that [an] aider/abettor is equally liable with the perpetrator." We are not persuaded. *Samaniego* involved a challenge to former CALCRIM No. 400, which included the language: " 'A person is *equally guilty* of the crime whether he or she committed it personally or aided or abetted the perpetrator who committed it.' " (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1163.) The Court of Appeal first held that, because this instruction was "generally an accurate statement of law," though potentially misleading, the defendant forfeited the issue on appeal by failing to request modification of the instruction. (*Ibid*.) The court then explained the reason the "equally guilty" language was potentially misleading: " '[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own *mens rea*. If that person's *mens rea* is more culpable than another's, that person's guilt may be deemed greater even if the other might be deemed the actual perpetrator.' " (*Id*. at p. 1164, quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) The court then explained that the same reasoning "leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state," and concluded: "Consequently, [former] CALCRIM No. 400's direction

33

that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether or not he or she committed it personally or aided and abetted the perpetrator who committed it' [citation], while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified." (*Samaniego* at pp. 1164-1165.) Similarly, *Nero*, *supra*, 181 Cal.App.4th 504, involving former CALJIC No. 3.00, held that analogous "equally guilty" language was "confusing and should be modified" even in unexceptional cases. (*Nero* at p. 518.)

Howard's reliance on *Samaniego* and *Nero* is misplaced for two reasons. First, CALCRIM No. 400 has been amended to remove the "equally guilty" language. (*Lopez*, *supra*, 198 Cal.App.4th at p. 1119, fn. 5.) Thus, Howard's jury was not instructed with the language held to be potentially misleading in *Samaniego* and *Nero*. Nor do we agree with Howard's argument that the amended language nevertheless "conveyed to jurors the principle that the aider and abettor is vicariously liable for the intent, as well as the conduct, of the direct perpetrator."

Second, unlike *Samaniego* and *Nero*, this is not a case in which Howard aided and abetted *a murder* and therefore could be found guilty of a *lesser* homicide-related offense based on his individual mental state. He was convicted of attempted robbery and first degree felony-murder. Immediately after the challenged instruction, the jury was given CALCRIM No. 401, which provided: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime." Read

34

together, CALCRIM Nos. 400 and 401 correctly instructed the jury to evaluate Howard's mental state to determine whether or not he aided and abetted the attempted robbery. And, as we have already explained, once the jury found Howard aided and abetted the attempted robbery, liability for first degree felony-murder followed from the fact Wilson was killed during the commission of the attempted robbery. The jury was properly instructed on felony-murder with CALCRIM No. 540B.

Finally, we also reject Howard's related claim the prosecutor "aggravated the harm wrought by the instructional error" by arguing to the jury that "an aider and abettor is equally guilty with the direct perpetrator." As we have explained, there was no instructional error. Nor did the prosecutor, based on the facts of this case, misstate the law in his argument to the jury.

We conclude the trial court did not err in instructing the jury with CALCRIM No. 400 on aiding and abetting.

### III

### *Instructional Error – CALCRIM Nos. 520 & 521*

Howard also contends his constitutional rights were violated because CALCRIM Nos. 520 and 521, defining the crime of murder, "erroneously said that an aider and abettor can be held vicariously liable for the perpetrator's intent." Again, because Howard did not object to these instructions at trial, the issue is forfeited unless the error resulted in a miscarriage of justice under *People v. Watson*, *supra*, 46 Cal.2d 818. (*People v. Anderson*, *supra*, 152 Cal.App.4th at p. 927.) While we agree these instructions, as delivered to Howard's jury, misstate the law, we nevertheless conclude no miscarriage of justice occurred.

As given to Howard's jury, CALCRIM No. 520 instructed: "The defendant is charged in Count One with murder. [¶] To prove the defendant is guilty of this crime as an aider and abettor, the People must prove that: [¶] 1. The perpetrator committed an act that caused the death of another person; and [¶] 2. When the perpetrator acted, he [or

35

she] had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought; Express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The perpetrator acted with express malice if he or she unlawfully intended to kill. [¶] The perpetrator acted with implied malice if: 1. He [or she] intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he or she acted, he [or she] knew his [or her] act was dangerous to human life; and [¶] 4. He [or she] deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will towards the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] If you decide that the defendant committed murder, you must decide whether it is murder of the first or second degree."

CALCRIM No. 521, as given to Howard's jury, instructed: "The defendant has been prosecuted for first-degree murder under two theories: [¶] 1. The murder was willful, deliberate and premeditated; and [¶] 2. Felony murder. [¶] Each theory of first-degree murder has different requirements, and I will instruct you on both. [¶] You may not find the defendant guilty of first-degree murder unless all of you agree that the People have proved that the defendant committed murder. But all of you do not need to agree on the same theory."

With respect to the first of these theories, the instruction continued: "A defendant is guilty of first-degree murder if the People prove that the perpetrator acted willfully, deliberately and with premeditation. The perpetrator acted willfully if he [or she]

36

intended to kill. The perpetrator acted deliberately if he [or she] carefully weighed the considerations for and against his [or her] choice and, knowing the consequences, decided to kill. The perpetrator acted with premeditation if he [or she] decided to kill before completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person-to-person and according to the circumstances. A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] Murder which is not first-degree murder is murder of the second degree. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first-degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first-degree murder."

With respect to the felony-murder theory, the jury was instructed with CALCRIM No. 540B. Howard does not argue that his instruction was erroneous in any way. Nor do we find fault with it.

The problem, argues Howard, is with CALCRIM Nos. 520 and 521. Specifically, these instructions "stated that an aider and abettor could be held liable for murder based on vicarious liability for the direct perpetrator's malice and premeditation." We agree. When the version of CALCRIM No. 520 delivered to Howard's jury is compared with the version in the pages of the Judicial Council of California Criminal Jury Instructions, the error becomes clear. The phrase "as an aider and abettor" has no place in the instruction. CALCRIM No. 520 defines the elements of murder. The aiding and abetting instructions (CALCRIM Nos. 400-404) define the circumstances in which a person may be found guilty of a crime as an aider and abettor. Here, as stated, the jury was properly instructed on aider and abettor liability. Had CALCRIM No. 520 been given in

37

unmodified form, the jury would have been able to decide (1) whether or not a murder was committed, and (2) using the aiding and abetting instructions, whether Howard was guilty of this crime as an aider and abettor. Instead, CALCRIM No. 520 was modified from "[t]o prove that the defendant is guilty of [murder], the People must prove that: [¶] 1. The defendant committed an act that caused the death of (another person/[or] a fetus); [¶] 2. When the defendant acted, (he/she) had a state of mind called malice aforethought" to "[t]o prove the defendant is guilty of [murder] *as an aider and abettor*, the People must prove that: [¶] 1. *The perpetrator* committed an act that caused the death of another person; and [¶] 2. When *the perpetrator* acted, he had a state of mind called malice aforethought." (Italics added.) Then, "defendant" is changed to "perpetrator" throughout the remainder of CALCRIM No. 520 as given. The problem is that this modification suggests Howard may be found guilty "as an aider and abettor" to Wilson's murder as long as Powell, "the perpetrator," committed the murder.

This error continues into CALCRIM No. 521. The portion of this instruction defining deliberate and premeditated murder was modified from "the defendant is guilty of first degree murder if the People have proved that (he/she) acted willfully, deliberately, and with premeditation" to "[a] defendant is guilty of first-degree murder if the People prove that *the perpetrator* acted willfully, deliberately and with premeditation." (Italics added.) This is wrong. (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1118 [an aider and abettor's "mental state is her [or his] own; she [or he] is liable for her [or his] mens rea, not the other person's"]; *People v. Concha* (2009) 47 Cal.4th 653, 665 ["for murder, a defendant cannot be held vicariously liable for the mens rea of an accomplice"].)

Nevertheless, we find the error to be harmless. While CALCRIM Nos. 520 and 521 erroneously suggested Howard could be found guilty of first degree murder as an aider and abettor to Wilson's murder as long as Powell killed Wilson willfully and with deliberation and premeditation, the prosecutor was clear in his closing argument that there was no evidence Howard aided and abetted Wilson's murder. Instead, the

38

prosecutor argued Howard aided and abetted an attempted robbery, and Wilson's death, occurring during the commission of that crime, amounted to first degree felony murder. The prosecutor also argued, as "fall back" theories, that Howard either conspired to commit or aided and abetted an assault, the natural and probable consequence of which was first degree premeditated murder. Accordingly, CALCRIM Nos. 520 and 521, to the extent they stated an improper basis to find Howard guilty of first degree murder, were irrelevant to the prosecution's theories of the case. And the jury was properly instructed that some of the instructions may not apply. Moreover, the jury was properly instructed on aiding and abetting liability, attempted robbery, and the doctrine of felony murder. The jury found Howard guilty of attempted robbery. The evidence conclusively demonstrated Wilson was killed during the commission of that crime. Based on these circumstances, we conclude the jury must have found Howard guilty of first degree felony murder, as the prosecutor argued.

## IV

### *Denial of Request to Release Juror Identifying Information*

Howard contends the trial court abused its discretion by denying his petition to release juror identifying information for purposes of investigating potential juror misconduct. We reject this contention.

### A.

### *Additional Background*

Following Howard's conviction, in conjunction with the aforementioned new trial motion, his defense counsel filed a petition seeking an order compelling the release of juror identifying information.

In support of the petition, Howard's defense counsel declared: "It is my belief that during the trial that jury misconduct occurred. This belief is based on the following facts: During the trial I personally noted that jurors and the family and/or supporters of [Wilson] used the same bathroom on the first floor. I have been contacted by two

39

individuals.  One of which I had my investigator interview and that interview is attached.  The second, [Robinson] is being interviewed today.  The interviews were delayed due to my starting a trial the day after I finished closing arguments in [Howard's] case followed by my getting very ill with a bad sinus infection.  Base[d] on my conversations with these individuals and a reading of the interviews I believe misconduct took place.  I requested funding from the panel to find and interview the jurors but that funding was not granted.  I believe if the court grants this petition we will be able to get funding to talk with the jurors in this case.  Further investigation is necessary to verify and develop facts in order to present the court with adequate information on which to rule for a motion for new trial."

The investigator's report, attached to the petition, stated in relevant part:  "[A]fter several attempts to contact Nikesha Hills, she returned my phone message.  I repeated my identification as the investigator working for [Howard's defense counsel].  [¶]  [Hills] is the sister of Canteel Hills, the mother of [Howard's] child.  [¶]  [Hills] stated that during the course of the trial she saw a couple of the jurors around the victim's family and appeared to be talking with them.  She said that she could not be sure if it was a two way conversation but the victim's family was making comments about the guilt of [Howard] and that he should be in prison.  [¶]  [Hills] said that she also saw jury members around the restroom at the same time as the victim's family and there were similar conversations going on.  [¶]  [Hills] also said that she saw a couple of plain clothes police officer[s] talking with the victim's family and giving them business cards.  [¶]  On another occasion some members of the family threatened to 'punch [Hills] in the face.'  [¶]  [Eight days later,] I contacted [Hills] to clarify her statement and she said that two of the jurors stand out in her mind as being around the family when they were commenting on [Howard] and his guilt and that he belonged in prison.  [¶]  She described the two that she remembered best as:  [¶]  A short (4'11") Hispanic female approximately 20 years of age.

40

And [¶] An older (30's) white woman who was taller. [¶] [Hills] is 26 years of age and works as an in-home care giver."

During the hearing on the petition, Howard's defense counsel added: "[W]hile I don't have the other reports, because I haven't gotten them from my investigator, I just have the juror list report from him, I did speak with various family members who spotted jurors in the same locations as some of the family members of the deceased. [¶] I think that can be problematic, in that the jury could have been tainted by hearing their versions of what occurred in court and their versions of things that may have been told to them that did not appear in court. [¶] I think as counsel I would be incompetent if I did not at least investigate that issue. And in order to investigate that issue, I need to find out the juror's contact information. [¶] If even one juror was tainted in some way, then I think [Howard] would have been put at a disadvantage at this trial. [¶] We do know there was activity, going's on within even the courtroom where one juror was called 'ghetto' by one of the people viewing. It was not one of the family members, I will note. [¶] It was my understanding it was actually the victim's person, support person, so I am not saying that the family said that. [¶] But I do believe that there was a lot of chance here, and a lot of opportunity, and I think there could have been things that were said in front of jurors that shouldn't have been said in front of jurors. [¶] I know I personally witnessed jurors in that first floor bathroom at the same time as family members. Of course when counsel was there, nobody ever talks about a case. But it's very understandable that the family members would talk about the case and their version of what was going on, and there may have been pressure put on the jurors. [¶] And again, I believe it would be necessary because the family members overheard things including, you know, things involving how guilty [Howard] was, how he admitted he was there, things like that, that I think need to be investigated, and I think we need to have that information before I can do the full investigation."

41

The trial court denied the petition. After pointing out Hills's statement to the defense investigator simply revealed certain of Wilson's family members "appeared" to be talking to certain jurors about Howard's guilt, but that "she could not be sure if it was a two way conversation," the trial court ruled: "[T]he law requires good cause to be demonstrated for the release of [juror contact] information. [¶] The Court finds that there is no prima facie showing of good cause. That statement that is attached to the petition does not contain any affirmative evidence that there was potential or that in fact misconduct occurred. [¶] Again, the proximity of jurors to spectators in the courtroom, or to parties, witnesses, investigators, and others, during the course of the trial, is commonplace throughout our state, and particularly in this courthouse, where there [are] very few public restrooms that are available to people while they are here in the courthouse. [¶] And just because persons are seen, just because there is the possibility of, just because there in fact may have been passing contact, does not demonstrate good cause to engage in an investigation of jurors. [¶] So the Court denies the petition to release the contact information of the jurors."

**B.**

*Analysis*

Code of Civil Procedure section 237, subdivision (a)(2), provides: "Upon the recording of a jury's verdict in a criminal proceeding, the court's record of personal juror identifying information of trial jurors, as defined in Section 194, consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section." Subdivision (b) of this section provides in relevant part: "Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal juror identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal identifying information." (Code Civ. Proc., § 237, subd.

42

(b).)  Code of Civil Procedure section 206, subdivision (g), authorizes "a defendant or defendant's counsel" to "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose," and provides that the court shall consider such petition in accordance with Code of Civil Procedure section 237.

To demonstrate good cause for the release of juror identifying information, a defendant must make " 'a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.' " (*People v. Jones* (1998) 17 Cal.4th 279, 317, quoting *People v. Rhodes* (1989) 212 Cal.App.3d 541, 551-552; *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990 ["Even though *Rhodes* was decided before the statute's present enactment requiring a showing of good cause, the *Rhodes* test survived the amendments"].)  Denial of a petition for the release of juror identifying information is reviewed for abuse of discretion.  (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1097; *People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

Here, the trial court did not abuse its discretion in determining passing contact between jurors and the victim's family members in common areas in the courthouse, where there was no showing such contact amounted to two-way conversation, did not constitute good cause to release juror identifying information.  The showing was not sufficient to support a reasonable belief juror misconduct occurred.  And contrary to Howard's argument on appeal, the trial court did not "improperly [hold] trial counsel to a burden of establishing juror misconduct before counsel had access to the jurors and an opportunity to investigate."  The trial court's comments on the record do not suggest a misunderstanding of the good cause standard.  While the good cause standard does not require absolute proof of juror misconduct, nor does it "mandate disclosure of jurors'

names, addresses, and telephone numbers upon request" to allow counsel to "engage in merely a fishing ex[pedition]." (*People v. Wilson* (1996) 43 Cal.App.4th 839, 853.) What is required is reasonable belief misconduct occurred. A juror's mere presence in public areas of the courthouse while comments are made regarding the case does not provide a reasonable basis to believe the juror engaged in misconduct.

The trial court did not abuse its discretion in denying Howard's petition for release of juror identifying information.

## V

### *Presentence Custody Credit*

Finally, Howard claims he is entitled to an additional 21 days of presentence custody credit. As Howard explains, "[t]he total actual days spent in custody from arrest to sentencing was 1057 days, not 1036 days." The Attorney General concedes this to be the case. We accept the concession and modify the judgment to award Howard an additional 21 days of presentence custody credit.

In sum, we strike Howard's special circumstances finding and vacate his sentence of life without the possibility of parole. Because the sentence mandated for first degree murder (without the special circumstances finding) is 25 years to life, we modify the judgment to impose this term of imprisonment. We also modify the judgment to award Howard an additional 21 days of presentence custody credit. The modified judgment is affirmed.

KANE AND POWELL APPEAL

## I

### *Failure to Instruct the Jury to Begin Deliberations Anew*

Kane and Powell contend the trial court prejudicially erred and violated their constitutional rights by failing to instruct the jury to begin deliberations anew after an alternate was substituted onto the jury. We disagree.

44

## A.

### *Additional Background*

On March 25, 2011, at 10:55 a.m., after the prosecutor concluded his rebuttal argument, the trial court began instructing the jury on the law. The jury was informed the instructions would take "about 90 minutes." After receiving some of the instructions, the jury was excused for lunch at 11:00 a.m. At 1:30 p.m., the jury returned to the courtroom, received the remaining instructions, and was then taken to the deliberation room. The record does not reveal the exact time deliberations began. However, if the trial court's 90-minute estimate is credited, the jury was taken to the deliberation room at about 2:55 p.m. At 4:15 p.m., the jury was released for the evening recess and ordered to return the following Monday at 10:00 a.m.

That Monday, at 8:30 a.m., the trial court received a communication from Juror No. 3 asking to be removed from the jury. At 10:00 a.m., after meeting with Juror No. 3, and with the stipulation of all counsel, the trial court removed Juror No. 3 from the jury and replaced the juror with an alternate. The trial court then excused the new member of the jury to join the rest of the jury in the deliberation room. The newly-constituted jury deliberated until 4:20 p.m. The following day, the jury deliberated from 9:00 a.m. until 3:00 p.m., at which point the jury announced it had reached a verdict.

## B.

### *Analysis*

Section 1089 provides in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

45

In *People v. Collins* (1976) 17 Cal.3d 687 (*Collins*), our Supreme Court held that, in order to comport with the right to jury trial guaranteed by the California Constitution, section 1089 must be construed to require "that deliberations begin anew when a substitution is made after final submission to the jury. This will insure that each of the 12 jurors reaching the verdict has fully participated in the deliberations, just as each had observed and heard all proceedings in the case. We accordingly construe section 1089 to provide that the court instruct the jury to set aside and disregard all past deliberations and begin deliberating anew. The jury should be further advised that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had." (*Id*. at p. 694.)

Here, as in *Collins*, *supra*, 17 Cal.3d 687, the jury was given no such instruction following substitution of an alternate onto the jury. The only question is whether the error requires reversal. *Collins* held that "a failure to properly admonish the jury [in this regard] is not per se reversible error. Instead, since the admonition requirement is imposed as a function of the state Constitution rather than by federal law, error is tested by the standard of *People v. Watson*, *supra*, 46 Cal.2d 818, 836: it is reversible only if it is probable that the defendant would have achieved a better result but for the error." (*People v. Renteria* (2001) 93 Cal.App.4th 552, 559, citing *Collins*, *supra*, 17 Cal.3d at p. 697, fn. 5.) In making this determination, "we may consider whether the case is a close one and compare the time the jury spent deliberating before and after the substitution of the alternate juror." (*People v. Proctor* (1992) 4 Cal.4th 499, 537 (*Proctor*); *People v. Odle* (1988) 45 Cal.3d 386, 405 (*Odle*), abrogated on another ground as stated in *People v. Prieto* (2003) 30 Cal.4th 226, 256.)

46

In *Proctor*, *supra*, 4 Cal.4th 499, our Supreme Court concluded there was no prejudice where the evidence against the defendant was "extremely strong" and "[t]he jury had deliberated less than one hour prior to substitution of the alternate, and continued to deliberate for two and one-half days thereafter." (*Id*. at pp. 537-538.) In *Odle*, harmless error was found "where the case against the defendant was overwhelming and where the jury deliberated only part of one afternoon prior to substitution of the alternate juror and two and one-half days thereafter." (*Id*. at p. 537.) And in *Collins*, "the error was not prejudicial where the case against the defendant was very strong, and the jury had deliberated little more than one hour prior to substitution of the alternate and had returned a verdict after several additional hours." (*Ibid*.)

In this case, we conclude the evidence against both Powell and Kane was strong. Eyewitnesses placed Kane at the scene driving the getaway van. The shooter was described as being shirtless, and after the shooting, Powell arrived at the Trap without a shirt. Kane testified Powell was the shooter. McCoy testified Powell admitted to being the shooter. Kane also testified she and Cooks set up the meeting with Wilson after encountering him at the Costco parking lot. The phone records revealed a series of phone calls, some going to voicemail, between Kane and Powell, Cooks and Scoggins, and Powell and Scoggins, shortly before the shooting. One of these calls, between Kane and Powell, was overheard by Tate, who told police she heard Kane say: "We got the dude that sold the fake TV's." A short time later, Powell left Tate's house to "meet up with his brothers," which Tate understood to mean Scoggins and Howard. Cooks sent a text message to Scoggins, which read: "Man you ain't answerin' the phone and the dude dat sold you the tvs is in my face right now." According to McCoy's testimony, around the same time Scoggins called the Trap and told him about the plan to rob Wilson. The phone was then passed to Howard, who left a short time later. All of this evidence, as well as the fact Kane and Cooks employed a ruse to convince Wilson to meet them, i.e., Cooks pretending to be Kane's mother, casts considerable doubt on Kane's innocent

47

explanation for setting up the meeting. Following the shooting, Kane, Powell, Cooks, and Howard fled together. We conclude this to be strong evidence Kane and Powell were involved in the planning and execution of an attempted robbery, and that Powell shot Wilson during the commission of this crime, amounting to first degree felony murder. And for reasons already stated, this evidence also established the felony-murder special circumstances.

In addition to the strong evidence of guilt, the record reveals the jury deliberated for a short period of time before the alternate was substituted onto the jury. While the precise amount of time is not known, if the trial court's 90-minute estimate for the amount of time it would take to deliver the jury instructions is credited, the jury deliberated for a little more than an hour before the substitution. And even if that estimate is off, we find it hard to imagine the instructions took less than an hour, meaning the jury could not have deliberated for longer than two hours before the substitution. After the substitution, the newly-constituted jury deliberated for an entire day and most of a second day. Thus, as was the case in *Collins*, *supra*, 17 Cal.3d 687, *Proctor*, *supra*, 4 Cal.4th 499, and *Odle*, *supra*, 45 Cal.3d 386, we conclude the instructional error was harmless.

## II

### *Failure to Instruct the Jury to View Kane's Statement to Powell with Caution*

Kane also claims the trial court prejudicially erred and violated her constitutional rights by failing to instruct the jury to view with caution her pre-trial statement to Powell, i.e., "[w]e got the dude that sold the fake TV's." Kane's pre-trial statement to Powell was admitted through the testimony of Tate. At trial, Kane denied making the statement. We agree such an instruction should have been given, but conclude the error was harmless.

The trial court instructed the jury with CALCRIM No. 358 as follows: "Now you've heard evidence that . . . a defendant made an oral or written statement . . . before

48

the trial. [¶] You must decide whether a defendant made such a statement in whole or in part. [¶] If you decide that a defendant made such a statement, consider the statement along with all the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statement." The following bracketed language was omitted: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."

"A trial court has a sua sponte duty to instruct the jury to view a defendant's oral admissions with caution if the evidence warrants it." (*People v. Wilson* (2008) 43 Cal.4th 1, 19; *People v. Dickey* (2005) 35 Cal.4th 884, 905 (*Dickey*).) The evidence warrants such an instruction when a defendant has made "any extrajudicial statement ― whether inculpatory or exculpatory ― 'which tends to prove [the defendant's] guilt when considered with the rest of the evidence.' " (*People v. Mendoza* (1987) 192 Cal.App.3d 667, 676.) Considered with the rest of the evidence, Kane's statement to Powell tends to prove she was involved in setting up the attempted robbery, rather than simply trying to help her friend Cooks purchase a television, as she claimed on the witness stand. The instruction should have been given.

"The standard of review for erroneous failure to give the cautionary instruction is 'the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to [the] defendant had the instruction been given.' " (*Dickey*, *supra*, 35 Cal.4th at p. 905.) Our Supreme Court explained: " 'Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]' [Citation.] [¶] Where there was no such conflict in the evidence, but simply a denial by the defendant that he [or she] made the statements attributed to him [or her], we have found failure to give the cautionary instruction

49

harmless. [Citation.]" (*Id*. at pp. 905-906.) Finding no prejudice in *Dickey*, the court explained: "[D]efendant denied making the statements attributed to him, and the question for the jury was whether [the witnesses who testified to these statements] were credible witnesses or had fabricated their testimony concerning his admissions to them. [W]hile neglecting to give the cautionary instruction, [the trial court] did in other respects thoroughly instruct the jury on judging the credibility of witnesses. The jury was instructed on the significance of prior consistent or inconsistent statements of witnesses, discrepancies in a witness's testimony or between his or her testimony and that of others, witnesses who were willfully false in one material part of their testimony being distrusted in other parts, weighing conflicting testimony, evidence of the character of a witness for honesty and truthfulness to be considered in determining the witness's believability, and was given a general instruction on witness credibility that listed other factors to consider, including a witness's bias, interest or other motive, ability to remember the matter in question, and admissions of untruthfulness." (*Id*. at p. 906.)

Here, like *Dickey*, *supra*, 35 Cal.3d 884, there was no conflict in the evidence about the precise words used, their meaning or context, or whether they were accurately heard, remembered, and repeated. Kane denied making the statement altogether. Also like *Dickey*, the trial court exhaustively instructed the jury on matters of witness credibility. Specifically, the jury was instructed to consider, among other things, "how well could the witness see, hear or otherwise perceive the things about which the witness testified." The jury was also told to consider whether "the witness's testimony [was] influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, [or] a personal interest in how the case is decided." Here, Tate testified she was with Powell when Kane called him and Tate overheard Kane's statement to Powell while they were on the phone. The jury knew Tate and Powell were involved in a romantic relationship at the time of the shooting, Powell was dating Kane on the side, and Tate did not like Kane. Thus, the jury would have been alerted to the

50

possibility Tate was unable to hear Kane's part of the conversation and she harbored a bias against Kane. From these instructions, we conclude the jury would have viewed Tate's testimony concerning Kane's statement with caution.

Moreover, other factors weighed in favor of Tate's believability. For instance, the jury was told to consider whether the witness had made a prior consistent or inconsistent statement. Tate's testimony about Kane's statement to Powell was consistent with her prior statement to a detective made 11 days after the shooting. The jury was also told to consider whether the testimony was "reasonable" when considered with "all the other evidence in the case," and whether "other evidence prove[d] or disprove[d] any fact about which the witness testified." Other evidence proved the phone call between Kane and Powell was made, that Cooks informed Scoggins around the same time via text message they had found the man who sold him the fake televisions, that Scoggins called the Trap about the plan to rob Wilson, that Kane and Cooks set up the meeting with Wilson by pretending Cooks was Kane's mother who wanted to purchase a television, and Powell, Scoggins, and Howard attempted to rob Wilson when he arrived at the meeting place. Considered with this other evidence, it is reasonable Kane said to Powell during the phone call he received at Tate's house: "We got the dude that sold the fake TV's." Thus, even if the jury had been specifically instructed to consider Kane's statement with caution, we find no reasonable probability this would have changed the jury's view of the believability of Tate's testimony. Moreover, based on the strength of the other evidence against Kane, even if the jury were to have disbelieved Tate's testimony in this regard, we still would find no reasonable probability of a more favorable outcome. Thus, the trial court's failure to instruct the jury to consider Kane's statement to Powell with caution was harmless.

51

# III

### *Parole Revocation Fine*

Finally, Kane asserts the trial court's imposition of a parole revocation fine must be stricken as unauthorized.  The Attorney General concedes the issue.  We accept the concession.  The trial court sentenced Kane to serve an indeterminate term of life without the possibility of parole for the special circumstances murder conviction, plus a determinate term of two years for the attempted robbery, which was stayed pursuant to section 654, plus a consecutive term of one year for the firearm enhancement.  Because this sentence does not include the possibility of parole, we must modify the judgment to strike the parole revocation fine.  (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 [parole revocation fine unauthorized where defendant sentenced to life without the possibility of parole]; see also *People v. McWhorter* (2009) 47 Cal.4th 318, 380 [parole revocation fine imposed upon a stayed determinate term stricken where defendant was also sentenced to death].)

In sum, with respect to Kane, we modify the judgment to strike the parole revocation fine and affirm the modified judgment.  With respect to Powell, we affirm the judgment.

## SCOGGINS APPEAL

# I

### *Denial of Batson/Wheeler Motion*

Scoggins contends the trial court should have granted his motion to quash the jury panel because the prosecutor exercised a peremptory challenge to excuse one prospective juror on the basis of race.  We are not persuaded.

## A.

### *Additional Background*

The prosecution exercised peremptory challenges to remove four prospective jurors prior to removing D. from the panel.  Among these prospective jurors was W., a

52

college student who studied international relations at the University of the Pacific. She stated she would be starting her senior year in the fall and was "looking to go into the Peace Corps post-graduation, then after [her] two years of service go get [her] Master's at an institute in Monterey, then hopefully foreign service work or governmental work after that." Another prospective juror removed by the prosecution was T., who was also a college student. He studied mechanical engineering at the University of Portland and had recently finished his freshman year.

Immediately after removing T., the prosecution exercised a peremptory challenge on D., "a young African American female." Like W. and T., D. was a college student. She studied psychology and sociology at Notre Dame De Namur University and stated she would be starting her junior year in the fall. Her ultimate goal was to become a research psychologist specializing in mental disorders in children and adolescents.

Scoggins's defense counsel objected to D.'s removal. As he explained: "I objected to the prosecution's peremptory challenge to [D.] as I see no legitimate reason to ask for her to be excused. [¶] Although she is fairly young, she's educated, although she's in a field that sometimes prosecutors have a problem with in terms of, you know, what they consider a soft science I suppose, psychology, that her focus is primarily on adolescents."

The trial court then addressed the prosecutor: "[Y]ou are not required to be heard. The Court is not finding that there's a prima facie pattern that requires any explanation from you, but I'm not foreclosing you if you wish to say anything for the record." The prosecutor responded: "I will just state for the record that the current constitution of the people that are in the box are all dissimilar from [D.] and from the other people I've kicked. [¶] There are several, there were several young prospective jurors, either just out of high school or maybe just into their college years. [¶] I have excused every one of those individuals based on their youth and lack of life experience. [¶] And [D.], it's true, she is a double major in psychology and sociology. [¶] So those were all the reasons

53

why [D.] was excused." The trial court stated for the record that another prospective juror removed by the prosecution, M., was also "relatively young," and further stated one of the prospective jurors remaining in the box was African-American and another prospective juror appeared to be African-American. These prospective jurors were ultimately impaneled to try the case.

**B.**

*Analysis*

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. [Citations.] Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*).)

In determining whether to grant a *Batson*/*Wheeler* motion, the trial court uses a three-part test. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*Lenix*, *supra*, 44 Cal.4th at pp. 612-613.)

Here, the trial court did not find a prima facie showing of discriminatory use of a peremptory challenge. Nor did the trial court require the prosecutor to provide his reasons for removing D. from the jury. However, the trial court did allow the prosecutor to address Scoggins's defense counsel's objection to D.'s removal, the prosecutor provided race-neutral reasons for removing her, and the trial court appeared to accept his explanation as genuine, although the court did not expressly state it was satisfied by the

54

prosecutor's explanation. Thus, this case falls between *People v. Hawthorne* (2009) 46 Cal.4th 67 (*Hawthorne*), disapproved on another point in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643, and *People v. Mills* (2010) 48 Cal.4th 158 (*Mills*). In *Hawthorne*, the trial court "did 'not find a prima facie case' " of discrimination, but allowed the prosecutor to "give an explanation 'to protect the record.' " (*Hawthorne*, *supra*, 46 Cal.4th at p. 78.) After the prosecutor did so, the trial court denied the *Batson/Wheeler* motion, stating: " 'Again, the court does not find a prima facie case.' " (*Id*. at p. 79.) Our Supreme Court upheld the trial court's ruling as to the first stage of the analysis and did not address the third stage. (*Id*. at p. 80.)

In contrast, *Mills*, *supra*, 48 Cal.4th 158, involved a situation in which the trial court invited the prosecutor to volunteer his reasons for the challenged removals, then found the defense had not made a prima facie showing of discrimination, and then stated, " '[f]or [the] sake of argument,' " it was " 'satisfied . . . from the explanation given by the prosecutor' that the motivation for the challenges was not based on race." (*Id*. at pp. 173-174.) In these circumstances, our Supreme Court skipped to the third stage of the analysis. (*Id*. at p. 174.) Distinguishing *Hawthorne*, *supra*, 46 Cal.4th 67, the *Mills* court explained: "[T]he trial court here expressly considered and accepted the prosecutor's reasons, finding no evidence of racial bias, whereas the trial court in *Hawthorne* did not, but merely allowed the prosecutor to state her reasons on the record without passing judgment on those reasons." (*Mills* at p. 174, fn. 3.)

In this case, because the trial court expressly ruled it was "not finding that there's a prima facie pattern that requires any explanation" for removing D. from the jury, and did not expressly accept the prosecutor's race-neutral reasons for D.'s removal, we conclude this case is more analogous to *Hawthorne* than *Mills*. Thus, we must consider whether Scoggins "has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race." (*Lenix*, *supra*, 44 Cal.4th at p. 612.) Specifically, has he carried his burden of demonstrating the facts and circumstances of the case raise

55

an inference that the prosecutor removed D. based on race?  (*Hawthorne*, *supra*, 46 Cal.4th at p. 79.)  We conclude he has not.  Indeed, Scoggins's defense counsel's objection to D.'s removal acknowledges the existence of plausible race-neutral reasons for her removal, i.e., "she is fairly young," and "she's in a field that sometimes prosecutors have a problem with in terms of, you know, what they consider a soft science I suppose, psychology."  Moreover, as in *Hawthorne*, defense counsel "never claimed that the prosecutor used [his] peremptory challenges to strike most or all African-American prospective jurors from the jury venire [citation] or that there were no African-American prospective jurors remaining on the jury panel." (*Ibid.*)  Instead, the record reveals that, at the time of D.'s removal, the prosecutor removed one of two African-American prospective jurors and the trial court believed a third prospective juror may have been African-American.  The two remaining prospective jurors were ultimately seated on the jury.  (See *People v. Cornwell* (2005) 37 Cal.4th 50, 69-70, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [circumstance that the prosecutor challenged one of two African-American prospective jurors did not support an inference of discrimination where the other African-American prospective juror ultimately served on the jury].)  "Although the circumstance that the jury included a member of the identified group is not dispositive [citation], 'it is an indication of good faith in exercising peremptories' and an appropriate factor to consider in assessing a [*Batson/Wheeler*] motion." (*People v. Clark* (2011) 52 Cal.4th 856, 906.)

Because Scoggins failed to carry his burden of demonstrating the facts and circumstances of the case raised an inference the prosecutor excluded D. based on race, the trial court correctly denied his *Batson/Wheeler* motion.[5]

---

[5]      Scoggins also argues, for the first time on appeal, the prosecutor's stated reasons for removing D. should be subjected to a comparative juror analysis.  Having concluded this is a "first stage" *Batson/Wheeler* case, we need not engage in such an analysis. (*Hawthorne*, *supra*, 46 Cal.4th at p. 80, fn. 3.)  And even if this were a "third stage" case,

56

## II

### *Instructional Error – CALCRIM No. 403*

Finally, Scoggins asserts the trial court prejudicially erred and violated his constitutional rights by improperly instructing the jury on the natural and probable consequences doctrine. Specifically, he argues CALCRIM No. 403 "erroneously failed to inform the jury that in order to convict [him] of first degree murder under the natural and probable consequences doctrine, the jury would have to find that deliberate and premeditated murder was a natural and probable consequence of the intended assault of the victim." We disagree.

The jury was instructed with CALCRIM No. 403 on the natural and probable consequences doctrine: "The Defendant is charged in Count [One] with murder and in Count Two with attempted robbery. Before you may decide whether the Defendant is guilty of murder under this theory, you must consider whether the Defendant is guilty of assault. [¶] To prove that the Defendant is guilty of murder, the People must prove that: [¶] One, the Defendant is guilty of assault as an aider and abettor. [¶] Two, during the commission of assault a coparticipant in that assault committed the crime of murder. [¶] And, three, under all of the circumstances a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the assault. [¶] A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or an innocent bystander. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider all of the circumstances

requiring us to review the trial court's determination that the prosecutor's race-neutral reasons were credible (*Lenix*, *supra*, 44 Cal.4th at p. 613), a comparative juror analysis would not help Scoggins's cause. D. was far more similar to W. and T., also removed by the prosecutor, than she was to the two jurors Scoggins offers to refute the genuineness of the prosecutor's stated reasons.

established by the Defendant. [¶] If the murder was committed for a reason independent of the common plan to commit assault, then the commission of murder was not a natural and probable consequence of assault. [¶] *To decide whether the crime of murder was committed, please refer to the separate instructions that I will give you on that crime.* [¶] To decide whether the crime of assault was committed, again refer to the separate instructions that I will give you on that crime here in a moment. [¶] The People are alleging that the Defendant originally intended to aid and abet assault. If you decide that the Defendant aided and abetted that crime, and that murder was a natural and probable consequence of that crime, the Defendant is guilty of murder." (Italics added.)

The murder instructions then defined first and second degree murder. (CALCRIM Nos. 520 & 521.) Reading CALCRIM No. 403 together with CALCRIM Nos. 520 and 521, as we must, we conclude the jury would have understood that in order to convict Scoggins of *first degree murder* under a natural and probable consequences theory, it would have to find that a reasonable person would have known the commission of *first degree murder* was a natural and probable consequence of the commission of the assault. This is so because, while CALCRIM No. 403 refers to "murder" rather than "first degree murder," it specifically tells the jury to look to the murder instructions for a definition of murder, and these instructions defined both first and second degree murder. Thus, the jury would have read "murder" in CALCRIM No. 403 to mean "either first or second degree murder." So read, we believe the jury would have understood if first degree murder was a natural and probable consequence of the assault, then Scoggins was guilty of first degree murder under the theory, but if only second degree murder was such a consequence, then Scoggins was guilty of only second degree murder under the theory.[6]

_____

[6] We note the modified versions of CALCRIM Nos. 520 and 521 given to Scoggins's jury have the same flaw pointed out in our discussion of Howard's appeal. This error is not argued by Scoggins on appeal and is therefore forfeited. In any event, for the reasons expressed in connection with Howard's appeal, we would find the error to

58

In any event, we also conclude the claimed error was harmless. The jury was properly instructed on aiding and abetting liability, attempted robbery, and the doctrine of felony murder. The jury found Scoggins guilty of attempted robbery. The evidence conclusively demonstrated Wilson was killed during the commission of that crime. Based on these circumstances, we conclude the jury must have found Scoggins guilty of first degree felony murder. Indeed, the prosecutor argued the felony murder theory was "the easiest theory to find [Scoggins] guilty of murder" and explained the natural and probable consequences theory was simply "provided to . . . give [the jury] an understanding of how the law works in this area to explain . . . how a group can be responsible for acts committed by other members of that group and other acts that are considered natural and probable consequences."

In sum, with respect to Scoggins, we affirm the judgment.

DISPOSITION

In case No. C068210, defendant James Allen Howard's special circumstances finding is stricken, the sentence of life without the possibility of parole is vacated, and the judgment is modified to (1) provide for a term of 25 years to life; and (2) award an additional 21 days of pretrial custody credit. As modified, the judgment entered against defendant James Allen Howard is affirmed.

In case No. C068209, the judgment entered against defendant Randall Powell is affirmed.

In case No. C068209, the judgment entered against Jennifer Ella Kane, is modified to strike the parole revocation fine. As modified, the judgment entered against defendant Jennifer Ella Kane is affirmed.

---

be harmless. Nor does this error alter our analysis of the jury's interpretation of CALCRIM No. 403. While CALCRIM Nos. 520 and 521 erroneously suggested Scoggins could be found guilty of first degree murder as an aider and abettor to Wilson's murder as long as Powell willfully killed with deliberation and premeditation, they nevertheless correctly defined first and second degree murder.

59

In case No. C068971, the judgment entered against defendant Willie Scoggins is affirmed.

The trial court is directed to prepare amended abstracts of judgment (with respect to defendants James Allen Howard and Jennifer Ella Kane) reflecting the foregoing modifications and to forward certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.

                                        HOCH , J.

We concur:

RAYE , P. J.

MURRAY , J.